UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICO PAUL,                          )
                                    )
            Plaintiff(s),           )
                                    )
      v.                            )          Case No. 4:18-cv-02057-SRC
                                    )
TRAVIS PACHECO, et al.,             )
                                    )
            Defendant(s).           )

## Memorandum and Order

Plaintiff Rico Paul attempted to commit suicide by hanging himself from a bedsheet that he tied to a metal grate in the window of his suicide-watch-cell door.   Having survived the attempt, Paul brought Eighth-Amendment deliberate-indifference claims under 42 U.S.C. § 1983 against two correctional officers and the warden.   All three Defendants now move for summary judgment, arguing that the evidence does not support that their conduct rose to the level of deliberate indifference.   In deciding the motion, the Court must determine whether the Defendants took constitutionally sufficient measures to prevent Paul from attempting to commit suicide.

## I.    Background

Rico Paul, an inmate at the Eastern Reception, Diagnostic and Correctional Center at the time of the events in question, originally brought a 42 U.S.C. § 1983 action against correctional officer Paul Pacheco and Warden Troy Steele.   Doc. 1.   The Court dismissed all claims against Steele and the official-capacity claim against Pacheco, but found that Paul stated a plausible Eighth-Amendment deliberate-indifference claim against Pacheco in his individual capacity. Doc. 6.   The Court later appointed counsel for Paul.   Docs. 27, 28.

This case has taken many twists and turns, largely due to the deficient performance of Paul's previous court-appointed counsel.   For example, following a lengthy discovery process,

Pacheco filed a motion for summary judgment.   Doc. 84.   After Paul failed to timely respond to Pacheco's motion, the Court ordered him to show cause why the motion for summary judgment should not be granted.   Doc. 91.   Paul filed a response to the Court's show cause order, Doc. 92, but failed to respond in any way to Pacheco's Statement of Uncontroverted Material Facts.

After detailing the deficiencies of Paul's previous counsel and finding that "Paul's case involves a serious matter worthy of proper representation and a well-developed factual record," the Court denied Pacheco's motion for summary judgment, appointed Paul new counsel, and reopened discovery for 90 days.   Doc. 94 at pp. 3–4.

During a supplemental Rule 16 conference and motion hearing, the Court granted Paul's motion to file an amended complaint.   Doc. 105.   Paul's amended complaint brought claims against Travis Pacheco, a correctional officer assigned to the housing unit where Paul was on suicide watch; Peggy Somerville, Pacheco's supervisor; and Troy Steele, the Warden of the Correctional Center.   Doc. 107.   After the parties conducted additional discovery, Defendants moved for summary judgment.   Doc. 124.   Paul filed his response, Doc. 129, and Defendants filed their reply, Doc. 134.   The Court addresses the fully briefed summary-judgment motion below.

## II.   Uncontroverted material facts

Defendants, in accord with the Court's Local Rules, submitted a Statement of Uncontroverted Material Facts.   Doc. 125.   Paul responded, Doc. 128 at pp. 1–6, and added his own Statement of Uncontroverted Material Facts, Doc. 128 at pp. 7–15.   Defendants did not respond to Paul's Statement of Uncontroverted Material Facts, but instead filed their own Supplemental Statement of Uncontroverted Material Facts, Doc. 135, to which Paul responded, Doc. 141.   And while the Court denied the Parties' motions for leave to file certain exhibits

under seal, *see* Doc. 155, the Court's factual findings and analysis below do not rely on those

exhibits or require their inclusion in the record.

As the Court previously explained, Doc. 94, Rule 56(c)(1) of the Federal Rules of Civil

Procedure provides the procedures for supporting or opposing factual positions:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Relatedly, Rule 4.01(E) of this Court's Local Rules provides:

> (E) Every memorandum in support of a motion for summary judgment must be accompanied by a document titled Statement of Uncontroverted Material Facts . . . . Every memorandum in opposition must be accompanied by a document titled Response to Statement of Material Facts . . . . The Response must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citation(s) to the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the moving party's Statement of Uncontroverted Material Facts. All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 4.01(E).

Since Defendants did not respond to Paul's 76-paragraph Statement of Uncontroverted

Material Facts, Doc. 128, the Court deems Paul's properly supported facts in those paragraphs

admitted.

### A.      January 8, 2018 incident

Rico Paul, an inmate at the Correctional Center, had mental health issues and was "often

placed in suicide watch cells prior to January 8, 2018."   Doc. 128 at p. 1, ¶ 1; p. 7, ¶ 2; Doc.

128-2 at p. 6:12–21.   As of January 2018, Defendant Troy Steele served as the Warden at the

Correctional Center, Doc. 128 at p. 7, ¶ 3, and Defendant Travis Pacheco worked as a Correctional Officer I, Doc. 125 at ¶ 2.   Defendant Peggy Somerville, a Correctional Officer II, was Pacheco's direct supervisor.   Doc. 128 at p. 7, ¶¶ 5–6.

On January 8, 2018, Paul was placed on suicide watch in the C-Wing of Housing Unit #2 after a self-harm incident.   Doc. 128 at p. 1, ¶ 3; p. 2, ¶ 4; p. 7, ¶ 7; p. 11, ¶ 31.   Pacheco and Somerville were assigned to the unit.   Doc. 128 at p. 7, ¶ 7.   Once in a suicide-watch cell, Paul told correctional officers he was suicidal and repeatedly hit his head against a wall.   Doc. 128 at p. 11, ¶¶ 31–32; Doc. 128-3 at p. 1.   Correctional officers then moved Paul to a security bench for "mental health and medical evaluation" before moving him back to another suicide-watch cell.   Doc. 128-2 at p. 5:7–16; Doc. 128-3 at p. 1.

The suicide-watch cell that correctional officers placed Paul in contained only a sink, toilet, and metal bed frame.   Doc. 128 at p. 2, ¶ 6; Doc. 128-2 at p. 7:13–19.   The door to the cell had a small window with a metal grate.   Doc. 128 at p. 2, ¶ 7.   Along with the other suicide-watch cells in Housing Unit #2, Paul's suicide-watch cell contained a camera actively recording on the date of the incident.   Doc. 128 at p. 9, ¶ 22; Doc. 135 at ¶ 47.

While Paul was in the suicide-watch cell, he requested a bedsheet from another inmate. Doc. 128 at p. 11, ¶ 34.   Paul received the sheet via the "Cadillac" system, which involved an inmate passing the sheet to another inmate who was working near Paul's cell.   *Id.* at p. 11, ¶¶ 35–36.

Once Paul received the sheet, he formed a noose, used the metal grate on the cell-door window as a tie-off point, then placed his head through the noose to hang himself.   *Id.* at p. 11, ¶¶ 37–38.   While Paul was hanging from the noose, Pacheco performed a suicide check of Paul's cell.   *Id.* at p. 11, ¶ 39.   When Pacheco signed the log and began walking away from Paul's cell, other inmates across the wing—who could see Paul hanging from the noose—began

banging on their cell doors and calling for Pacheco to check on Paul.   *Id.* at p. 12, ¶¶ 43–44; Doc. 128-9; Doc. 128-2 at p. 11:1–12.   But Pacheco continued to walk away ultimately leaving the C-Wing, the part of Housing Unit #2 where Pacheco's suicide-watch cell was located.   Doc. 128 at p. 12, ¶¶ 45, 47.

Inmates continued calling out, leading Correctional Officer Roney to come into the wing from the nurse's station to check on Paul.   *Id.* at p. 12, ¶¶ 46, 48.   When Roney looked through the window into Paul's cell, he saw Paul hanging and immediately called for assistance.   *Id.* at p. 12, ¶¶ 49–51.   Roney later stated that the sheet was easy to see when Roney looked in, and it was obvious Paul was hanging.   *Id.* at p. 12, ¶ 50; p. 13, ¶ 52.

Roney and other correctional officers then entered the cell to render aid to Paul.   Doc. 128 at p. 6, ¶ 28.   Medical personnel arrived and assessed Paul.   Doc. 135 at p. 3, ¶ 48.   Paul began experiencing neck pain two or three weeks later, Doc. 135 at ¶ 51, and states that he "continues to suffer chronic neck pain, shoulder pain, and mental anguish."   Doc. 128 at p. 15, ¶ 76.

### B.      Suicide intervention procedures

As part of the effort at the Correctional Center to prevent inmate suicides, Warden Steele and the Chief of Mental Health Services implemented Standard Operating Procedure 12.4-1, "Suicide Intervention," effective September 13, 2016.   Doc. 128-26.   The document, signed by Warden Steele, purports to "establish[] guidelines and procedures for managing those offenders who may be determined suicidal and are at risk of causing injury to themselves."   *Id.* at p. 1.

The Suicide Intervention procedures include the requirement that suicidal inmates "be dressed in a department approved suicide watch garment," and provide that a Kevlar blanket "may be given upon recommendation of a qualified mental health professional."   *Id.* at pp. 5–6. The procedures also call for the use of "sand-bag snakes" at the base of the outside of suicide-cell doors in an attempt "to reduce potentially dangerous items being passed into the cell."   *See*

5

Doc. 128-26 at p. 5; Doc. 129 at p. 10; Doc. 128 at p. 13, ¶ 59.   Further, the procedures require "visual checks" of suicide-watch cells "by staff members occurring at unpredictable staggered intervals not to exceed every 15 minutes (such as 5, 10, 7 minutes) at least 5 times or more per hour, or as designated by a [qualified medical health professional]."   Doc. 128-26 at p. 6.

## III.   Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.   *See AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).   The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).   Self-serving, conclusory statements without support are insufficient to defeat summary judgment.   *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).   Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV.     **Discussion**

Paul asserts that the Defendants' conduct amounted to deliberate indifference to his serious medical needs in violation of the Eighth Amendment.   Doc. 129 at p. 1.   Defendants argue that they are entitled to qualified immunity because no evidence exists to support Paul's claim that they were deliberately indifferent.   Doc. 123 at pp. 3–11.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "To prevail against a claim of qualified immunity, a plaintiff must show (1) that the facts alleged or shown by the plaintiff make out a constitutional violation, and (2) that the constitutional right allegedly violated was 'clearly established.'"   *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232).   The Court may address either question first.   *Pearson*, 555 U.S. at 236.

The Eighth Amendment requires prison officials to provide inmates with medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).   "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."   *Estelle*, 429 U.S. at 104 (internal citations and quotations omitted).

"A plaintiff claiming deliberate indifference must establish objective and subjective components."   *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013) (citing *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009)).   "The objective component requires a plaintiff to demonstrate an objectively serious medical need," while "[t]he subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need."

*Id.* (citing *McRaven*, 577 F.3d at 980).   "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk."   *A.H. v. St. Louis County*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

The Eighth Circuit has recognized that a risk of suicide by an inmate is a serious medical need.   *See Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (citing *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir. 1991)).   Defendants do not dispute that Paul was at risk of attempting suicide.   Doc. 123 at p. 4.   Accordingly, Defendants concede that Paul has established the objective component of his deliberate-indifference claim.   *See id*.

To establish the subjective component of his deliberate-indifference claim, Paul must demonstrate that the Defendants "'actually knew that [Paul] faced a substantial risk of serious harm' and did not respond reasonably to that risk."   *See A.H.*, 891 F.3d at 726 (quoting *Drake*, 445 F.3d at 1042); *cf. Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012) ("In the jail suicide context, qualified immunity is appropriate when a plaintiff 'has failed to show . . . that his jailers have acted in deliberate indifference to the risk of his suicide.'" (quoting *Rellergert*, 924 F.2d at 796)).

"[W]here suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk."   *A.H.*, 891 F.3d   at 727 (quoting *Rellergert*, 924 F.2d at 796).   The Court "must objectively 'consider[] the measures taken in light of the practical limitations on jailers to prevent inmate suicides.'"   *Luckert*, 684 F.3d at 818 (alterations in original) (quoting *Rellergert*, 924 F.2d at 796)).   And "[i]n evaluating an official's response to a known suicide risk, [the Court] should be cognizant of how serious the official knows the risk to be."   *Id*. (quoting

8

*Gregoire,* 236 F.3d at 418).   The Court evaluates the parties' arguments regarding each

Defendant in turn.

> **A.      An issue of material fact exists as to whether Pacheco knew of, and intentionally delayed responding to, Paul's suicide attempt.**

Defendants argue that Paul's claim against Pacheco fails because the facts do not

demonstrate that he actually knew of and deliberately disregarded Paul's risk of suicide, and thus

Paul has not established that Pacheco's "actions were 'akin to criminal recklessness.'"   Doc. 123

at p. 6 (quoting *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019)).

In *Olson v. Bloomberg*, the Eighth Circuit affirmed denial of summary judgment to a

defendant correctional officer where the facts, viewed in the light most favorable to the plaintiff,

included evidence that the officer intentionally delayed responding to a known risk of suicide.

339 F.3d 730, 737–38 (8th Cir. 2003).   The Eighth Circuit noted that "[i]t is well settled that an

intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the

[E]ighth [A]mendment."   *Id.* at 738 (quoting *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir.

2001)).   Like the district court, the Eighth Circuit recognized the existence of a factual dispute.

The Eighth Circuit found that if the defendant "knew that there was a substantial risk of serious

harm" to the plaintiff, but deliberately disregarded that risk by, among other things, leaving the

area and "refusing to return when other inmates tried to inform him" that the plaintiff was

attempting to commit suicide, then "[the defendant's] conduct would rise to an Eighth

Amendment actionable level."   *Id.* at 738.

The Court finds a similar factual dispute here as to whether Pacheco intentionally delayed

responding to Paul's suicide attempt.   Defendants correctly point out that Paul "must cite to

evidence that shows there is a factual dispute on a genuine issue that is material to his claim"

rather than "rest upon mere allegations or denials of his pleading."   Doc. 134 at p. 2 (citing

*Anderson*, 477 U.S. at 259).   However, the Court disagrees with Defendants' contention that

9

"[Paul]'s opposition is largely based on [his] personal subjective and speculative assumptions, which unreasonably construe the facts of the case."   *Id.* at pp. 1–2.

As noted above, Paul filed a Statement of Uncontroverted Material Facts, supported by citations to Paul's own deposition and another inmate's sworn affidavit, among other things. Doc. 128 at pp. 7–15.   At this stage, the Court "must accept the facts as recited in the affidavits filed by the prisoners as true."   *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001) (citing *Grossman v. Dillard Dep't Stores, Inc.*, 47 F.3d 969, 971 (8th Cir. 1995) (stating that courts "may neither weigh evidence nor make credibility determinations at the summary judgment stage")).

According to Paul's depiction of the incident, while Paul was in the suicide-watch cell, he requested a bedsheet from another inmate.   Doc. 128 at p. 11, ¶ 34.   Paul received the sheet via the "Cadillac" system, which involved an inmate passing the sheet to another inmate who was working near Paul's cell.   *Id.* at p. 11, ¶¶ 35–36.

Once Paul received the sheet, he formed a noose, used the metal grate on the cell-door window as a tie-off point, then placed his head through the noose to hang himself.   *Id.* at p. 11, ¶¶ 37–38.   While Paul was hanging from the noose, Pacheco performed a suicide check of Paul's cell.   *Id.* at p. 11, ¶ 39.   While Defendants dispute whether Pacheco saw the noose in the Paul's cell window, they do not dispute that Pacheco knew Paul was on suicide watch when Pacheco performed his suicide check of Paul's cell.   *See* Doc. 123 at p. 6; Doc. 128-13 at p. 3:11–18; 11:4–15; *see also* Doc. 123 at p. 4 (stating that "it is not disputed that Plaintiff was at risk of attempting suicide").   Further, Pacheco stated during his deposition that he believed Paul had been in a suicide cell before.   Doc. 128-13 at p. 7:9–11.

Then, when Pacheco signed the log and began walking away from Paul's cell, other inmates across the wing—who could see Paul hanging from the noose—began banging on their

cell doors and calling for Pacheco to check on Paul again.   Doc. 128 at p. 12, ¶¶ 43–44; Doc.
128-9; Doc. 128-2 at p. 11:1–12.   But Pacheco continued to walk away, ignoring the other
inmates' calls and ultimately leaving the C-Wing.   Doc. 128 at p. 12, ¶¶ 45, 47.

The Court "recognize[s] that for a delay in medical care to rise to an Eighth Amendment
actionable level, the prison official must be aware of information 'such that a reasonable person
would know that the inmate requires medical attention.'"   *Olson*, 339 F.3d at 738 (quoting
*Tlamka*, 244 F.3d at 633).   As was the case in *Olson*, the facts here, taken in the light most
favorable to Paul, show that a reasonable officer in Pacheco's position would have known that
Paul "faced a substantial risk of serious harm."   *See id.*

Inmates continued calling out, leading Correctional Officer Roney to come into the wing
from the nurse's station to check on Paul.   *Id.* at p. 12, ¶¶ 46, 48.   When Roney looked through
the window into Paul's cell, he saw Paul hanging and immediately called for assistance.   *Id.* at
p. 12, ¶¶ 49–51.   Roney later stated that the sheet was easy to see when Roney looked in, and it
was obvious Paul was hanging.   *Id.* at p. 12, ¶ 50; p. 13, ¶ 52.

The Court notes that Paul's description of the incident differs from Pacheco's account;
for example, Pacheco stated during his deposition that he had "just barely even moved down a
few cells" and "had just checked on Mr. Paul" when other inmates began calling for Officer
Roney.   Doc. 128-13 at p. 13:15–25; 14:1–14.   According to Pacheco, Roney was first to
respond because "when CO Ronie [sic] came into the wing, they were calling directly for Ronie.
They didn't call and ask for me.   They called and asked for Officer Ronie.   So Ronie responded
to what they were saying and went to the cell."   Doc. 128-13 at p. 15:9–16.

But taking Paul's well-supported facts as true, as the Court must at this stage, the Court
finds that Paul has met his burden of establishing a genuine issue of material fact as to whether
Pacheco—who knew Paul was suicidal and reasonably should have known that Paul faced a

substantial risk of serious harm—exhibited deliberate indifference to Paul's serious medical needs.  *See Olson*, 339 F.3d at 737–38; *see also Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir. 2000) (stating that when a defendant raises a qualified-immunity defense, the plaintiff bears the burden to show that a question of fact precludes summary judgment).

Regarding the clearly established prong of qualified immunity, Defendants do not dispute that "[i]t is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the [E]ighth [A]mendment."  *Olson*, 339 F.3d at 738 (quoting *Tlamka*, 244 F.3d at 633).   And in light of *Olson*, the Court has no difficulty finding that it was well-established at the time of the incident in this case that a correctional officer violates the Eighth Amendment if he intentionally delays responding to a risk of suicide by leaving the housing wing and refusing to return to check an inmate's suicide-watch cell when other inmates try to inform him of the inmate's hanging.   *See Olson*, 339 F.3d at 738.   Accordingly, the Court denies Pacheco's motion for summary judgment.

> **B.    Somerville and Steele are entitled to qualified immunity because Paul has not met his burden to show that they were deliberately indifferent to his serious medical needs.**

Paul argues that Somerville and Steele are not entitled to qualified immunity because "[p]lacing a suicidal inmate in a cell where the inmate has access to dangerous items and tie-off points to attach a noose is deliberately indifferent to the inmate's serious medical needs."   Doc. 129 at p. 8.

In *Rellergert*, the Eighth Circuit outlined a framework for evaluating deliberate-indifference claims in inmate suicide cases:

> Generally, the deliberate indifference issue in inmate suicide cases arises under one of two broad fact situations.  First is a suicide or attempt that occurs when jailers failed to discover the decedent's suicidal tendencies.  Second is a suicide or attempt that occurs when jailers have discovered the tendencies and have taken preventive measures.  The legal inquiry is the same in both sets of cases: whether the jailers were deliberately indifferent to the risk of suicide.  This case

falls within the second scenario, thus the question turns on the adequacy of the preventive measures.

. . .

Whether or not the measures taken by jailers are sufficient to preclude a finding of deliberate indifference, thereby providing qualified immunity to the jailers, must be determined by considering the measures taken in light of the practical limitations on jailers to prevent inmate suicides.   Evaluation of the measures cannot be made from an ex post facto perspective.   Once a suicide has been accomplished in spite of preventive measures, it is all to [sic] easy to point out the flaws of failure.   The proper consideration of the measures implemented by the jailers can only be from an objective point of view.   While the jailers should learn from their failure to aid in the prevention of later suicides, we cannot fairly judge them by that failure.

924 F.2d at 796.

Paul argues that Somerville and Steele failed to take adequate measures to prevent inmates on suicide watch from having access to "dangerous items" and "tie-off points to attach a noose."   Doc. 129 at p. 8.   As in *Rellergert*, Paul's claim against Somerville and Steele falls within the second scenario, and so "the question turns on the adequacy of the preventative measures."   *Rellergert*, 924 F.2d at 796.

In Paul's view, Somerville and Steele "took no action to prevent Paul from being placed in an inadequate cell that presented a substantial risk of harm."   Doc. 129 at p. 8.   And, as the Eighth Circuit observed regarding the plaintiff's view of the jailers' efforts in *Rellergert*, "if [Paul's] statement were true, it would be clear deliberate indifference."   924 F.2d at 797.   But, as in that case, "[Paul's] statement is not true; it is a gross mischaracterization of the facts and demonstrates [the Eighth Circuit's] point that the search for blame or fault, particularly with the benefit of hindsight, can too easily infect what must be a dispassionate analysis."   *Id.*   The Court heeds the Eighth Circuit's admonition that:

Simply laying blame or fault and pointing out what might have been done is insufficient.   The question is not whether the jailers did all they could have, but whether they did all the Constitution requires.   The requirement for defeat of a claim of qualified immunity is that the evidence demonstrate deliberate indifference

by the jailers in the face of a known suicide risk at the time preventive measures were effected.

*Id.*

The preventative measures in place at the Correctional Center included those outlined in Standard Operating Procedure 12.4-1, "Suicide Intervention," effective September 13, 2016. Doc. 128-26.   The ten-page document, which bears Steele's signature as Warden, "establishes guidelines and procedures for managing those offenders who may be determined suicidal and are at risk of causing injury to themselves."   *Id.* at p. 1.

Per these procedures, Paul's suicide cell contained only a sink, toilet, and metal bed frame.   Doc. 128 at p. 2, ¶ 6.   The metal door to the cell contained a small opening secured by what the parties alternatively describe as a grate, or metal bars.   Doc. 128 at p. 2, ¶ 7; Doc. 123 at p. 4.   Other than the smock Paul wore, correctional officers only permitted Paul to bring a blanket into the cell.   Doc. 128 at p. 2, ¶ 8; *see also* Doc. 128-26 at pp. 5–6 (requiring suicidal inmates to wear a "suicide watch garment," and allowing a qualified mental health professional to recommend the use of a Kevlar blanket).   Further, correctional officers employed "sand-bag snakes" at the base of the outside of the suicide-cell door in an attempt "to reduce potentially dangerous items being passed into the cell."   *See* Doc. 128-26 at p. 5; Doc. 129 at p. 10; Doc. 128 at p. 13, ¶ 59.

Suicide-watch cells at the Correctional Center, including Paul's, contained a working camera.   Doc. 128 at p. 9, ¶ 20; p. 10, ¶ 22; *see also* Doc. 128-26 at p. 5 (requiring suicide-watch cells to "have either accessible visual observation or remote camera observation in accordance with the departmental procedure regarding security camera operations").   And while the parties dispute whether Pacheco observed Paul attempting to hang himself from a bar or grate in the cell window, it is undisputed that correctional officers, including Pacheco, performed multiple visual checks of the cell.   Doc. 128 at p. 2, ¶ 9; *see also* Doc. 128-26 at p. 6 (requiring

14

"visual checks by staff members occurring at unpredictable staggered intervals not to exceed every 15 minutes (such as 5, 10, 7 minutes) at least 5 times or more per hour, or as designated by a [qualified medical health professional]").

Paul briefly mentions two Fifth Circuit cases in support of his failure-to-take-preventative-measures argument.  *See* Doc. 129 at p. 8 (citing *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000); *Hare v. City of Corinth (Hare I)*, 36 F.3d 412 (5th Cir. 1994)).   In *Jacobs*, the Fifth Circuit held that a sheriff was deliberately indifferent to a risk of suicide when he placed an inmate—who the sheriff knew was suicidal—in a detox cell and ordered deputies to give the inmate a blanket and towel, "even though he knew that those items should not be in the hands of a seriously suicidal detainee."   228 F.3d at 395, 397.   The Fifth Circuit also noted that (1) the sheriff "acknowledged that it was not advisable to place a suicidal detainee in a cell with tie-off points, even though the detox cell had tie-off points"; and that (2) the sheriff "did nothing to eliminate or conceal the tie off points in the detox cell," despite being aware that another inmate previously committed suicide by securing a blanket to a tie-off point in the detox cell.   *Id.*

Paul also cites *Hare v. City of Corinth*.   But the ultimate result in that case undermines, rather than supports, Paul's argument.   Initially, a panel of the Fifth Circuit affirmed the district court's denial of jail officials' motion for summary judgment on qualified immunity grounds. *Hare I*, 36 F.3d 412 (the opinion Paul relies on, *see* Doc. 129 at p. 8).   But after electing to hear the case *en banc*, the Fifth Circuit clarified the appropriate deliberate-indifference standard for pre-trial detainees, vacated the denial of summary judgment, and remanded for application of the newly announced standard.   *Hare v. City of Corinth (Hare II)*, 74 F.3d 633, 636 (5th Cir. 1996) (en banc).

After the district court again denied qualified immunity to the jail officials, a Fifth Circuit panel reversed, finding that the officials were entitled to qualified immunity because their actions, which included leaving a blanket in a suicide-watch cell and conducting hourly checks, were *not* objectively unreasonable.  *Hare v. City of Corinth (Hare III)*, 135 F.3d 320, 329 (5th Cir. 1998).  Notably, the panel cited the Eighth Circuit opinion in *Rellegert* for the proposition that "[n]eedless to say, in this context, the objective reasonableness standard does not afford a simple bright-line test."  *Id.* at 328 (citing *Rellegert*, 924 F.2d at 797).

Despite Paul's argument to the contrary, these cases do not establish that metal grates or bars in suicide-cell windows are *per se* constitutionally impermissible.  In fact, both cases quote the Eighth Circuit's statement in *Rellegert* that while "the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be."  *Jacobs*, 228 F.3d at 394–95 (citing *Rellergert*, 924 F.2d at 797); *Hare III*, 135 F.3d at 328–29 (same).

Further, the Eighth Circuit has noted that suicide-prevention policies "could not have been both deliberately cautious about [an inmate's] risk as a suicide and deliberately indifferent about it."  *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (alteration in original) (citing *Rellergert*, 924 F.2d at 797).  In *Liebe*, the Eighth Circuit found that an officer who classified an inmate as a suicide risk and took preventative measures per prison policy—including placing him in a holding cell, removing his shoes and belt, and making periodic checks—was entitled to qualified immunity.  *Id.* (citing *Rellergert*, 924 F.2d at 797).

The same analysis applies to Paul's argument regarding the existence—and persistence—of the "Cadillac" system, which inmates used to move contraband throughout the Correctional Center.  Doc. 129 at p. 8.  Somerville and Steele both acknowledged the difficulty that the Cadillac system presented.  Doc. 128-14 at p. 3:6–4:6; Doc. 125-3 at p. 66:24–69:1.  But they

16

also took measures to combat the Cadillac system, including prohibiting other inmates from being near a suicide-watch cell without supervision, keeping an eye out for strings between cells, and filling fire hoses with dirt or sand to place in front of cell doors (including Paul's cell) as barriers.   Doc. 125-3 at p. 37:20–23; 67:18–69:1; Doc. 128 at p. 13, ¶ 59.

The facts of this case are similar to *Rellergert* and *Liebe*.   Here, as in those cases, prison officials implemented policies to protect inmates classified as suicide risks.   *See Liebe*, 157 F.3d at 578.   And as in those cases, the preventative measures in place represented "affirmative and *deliberate* steps to prevent suicides."   *Id.* (alteration in original) (citing *Rellergert*, 924 F.2d at 797).   Unfortunately, Paul obtained contraband that enabled him to attempt to commit suicide despite those measures.   *See id.*; *see also Luckert*, 684 F.3d at 819 ("Failure to follow written procedures does not constitute *per se* deliberate indifference.").   But examining the preventative measures in place, without the benefit of 20/20 hindsight, the Court cannot say as a matter of law that the measures were deliberately indifferent.   *See Liebe*, 157 F.3d at 578.

Paul also argues, without further elaboration, that Somerville is not entitled to qualified immunity because she "was Defendant Pacheco's direct supervisor in charge of ensuring Defendant Pacheco was accurately performing his duties to ensure the safety of inmates."   Doc. 129 at p. 10; *see also id.* at p. 2 ("Defendant Somerville had the responsibility to ensure Defendant Pacheco was properly performing safety checks." (citing Doc. 128 at p. 7, ¶ 6; Doc. 128 at p. 12, ¶ 42)).   But Paul has not provided any evidence that Somerville's alleged failure to supervise caused Paul's alleged constitutional violation, or was itself a constitutional violation. *See Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (noting that a supervisor can only be liable if he directly participates in a constitutional violation, or if his failure to train or supervise *caused* the deprivation (citing *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997))); *see also Iqbal*, 556 U.S. at 677 (holding that, "[a]bsent vicarious liability, each Government official, his

17

or her title notwithstanding, is only liable for his or her own misconduct").   Accordingly, Paul

fails to meet his burden, and Somerville and Steele are entitled to qualified immunity.   *See*

*Liebe*, 157 F.3d at 578.

**V.    Conclusion**

The Court in part grants and in part denies Defendants' [124] Motion for Summary

Judgment.   The Court denies the motion as to Defendant Pacheco, and the Court grants the

motion as to Defendants Somerville and Steele.   The Court directs the Clerk of Court to

terminate Somerville and Steele as parties to this suit.

Paul also moved for leave to amend his response to Defendants' Statement of

Uncontroverted Material Facts, to include previously omitted responses to paragraphs 29 through

39.   Doc. 151.   Defendants oppose.   Doc. 154.   Because the Court finds that the statements of

fact at issue do not alter the Court's analysis, the Court denies Paul's [151] Motion for Leave to

Amend as moot.

So Ordered this 9th day of June 2022.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE